UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X
:
JEANNE ANN BURTON, Trustee in           :
Bankruptcy for the Estate of Brad       :
Schwartzman, AND TRUSGAN, INC.,         :
:
                          Plaintiffs,   :
:
                -against-               :
:
LABEL, LLC, et al.,                     :
:
                          Defendants.   :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/30/2018

15-CV-5793 (VSB)

**OPINION & ORDER**

Appearances:

Samuel Okwudili Maduegbuna
William W. Cowles, II
Maduegbuna Cooper LLP
New York, NY
*Counsel for Plaintiffs-Counter Defendants Brad Schwartzman and Trusgan, Inc. and Special
Counsel for Jeanne Ann Burton, Trustee in Bankruptcy for the Estate of Brad Schwartzman, as
the plaintiff/real party-in interest*

John Houston Pope
Epstein, Becker & Green, P.C.
New York, NY
*Counsel for Defendants Automatic Data Processing, Inc. and ADP LLC*

Jason Solotaroff
Aliaksandra Ramanenka
Giskan Solotaroff Anderson & Stewart LLP
New York, NY
*Counsel for Defendants-Counter Claimants Label, LLC, Label, N.Y. LLC, David Miller, and
Jeremy Miller*

VERNON S. BRODERICK, United States District Judge:

On July 23, 2015, Plaintiffs Brad Schwartzman and Trusgan, Inc. (collectively,

"Plaintiffs") filed this action against two groups of defendants:  (1) Defendants Label LLC,

Label, N.Y. LLC, David Miller, and Jeremy Miller (collectively, "Label Defendants"), and

(2) Defendants Automatic Data Processing, Inc., ADP LLC, and Colin Barnett (collectively, "ADP Defendants"). On October 30, 2015, the Label Defendants filed their answer which contained defenses, affirmative defenses, and counterclaims. Before me are two motions to dismiss: (1) the ADP Defendants' motion to dismiss the Complaint in its entirety on the grounds that their contractual relationship is governed by ADP's terms of services agreement, and because it fails to state claims for defamation or negligent misrepresentation, and (2) Plaintiffs' partial motion to dismiss Label Defendants' counterclaims on the basis that the counterclaims fail to state claims under the Lanham Act and for tortious interference, and because exercising supplemental jurisdiction over the remaining state law counterclaims is inappropriate.

Because Plaintiffs have failed to state a claim against the ADP Defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation, the ADP Defendants' motion with respect to those claims is GRANTED. With respect to Plaintiffs' defamation claim, the ADP Defendants' motion to dismiss is DENIED. Plaintiff's motion for leave to amend the Complaint to allege additional facts in support of its claim for defamation is GRANTED.

Plaintiffs' partial motion to dismiss the Label Defendants' counterclaim for violation of the Lanham Act is GRANTED, but the Label Defendants may amend the counterclaim with respect to false advertising under the Lanham Act within thirty (30) days of this Opinion & Order. Plaintiffs' motion to dismiss the Label Defendants' state law counterclaims for lack of supplemental jurisdiction and for failure to state a claim for tortious interference is DENIED.

# I.    <u>Background</u>[1]

## A.    *Facts Alleged Against ADP in Plaintiffs' Complaint*

Label sells bespoke and custom men's clothing throughout the United States.  (Compl. ¶ 19.)[2]  David Miller and Jeremy Miler (together, the "Millers") are founding members of Label, and David Miller is a manager of the company.  (*Id.* ¶¶ 21, 24.)  In August 2013, Schwartzman started working for Label as Vice President of Sales and entered into an agreement entitled Binding Term Sheet – Cooperation Agreement ("Term Sheet").  (*Id.* ¶¶ 41, 43.)  The Term Sheet, among other things, outlined how Schwartzman was to be compensated.  (*Id.* ¶¶ 43–44.)  In the spring of 2014, while employed at Label, he established his own bespoke tailoring and made-to-measure men's clothing company, named Trusgan.  (*Id.* ¶ 13.)  Thereafter, Schwartzman provided his services to Label as an employee of, and through, Trusgan.  (*Id.* ¶ 53.)

In December 2013, Schwartzman and the Millers were introduced to Colin Barnett, an employee of ADP, who was interested in buying clothes from Label.  (*Id.* ¶ 58.)  Barnett did not purchase clothes, and instead offered ADP's account services to Label and Schwartzman.  (*Id.* ¶ 61.)  Label hired ADP to automate its employee payroll system, (*id.* ¶ 62), and began paying Trusgan for Schwartzman's services through ADP, (*id.* ¶ 63).

On April 22, 2014, Schwartzman also established an ADP account for Trusgan.  (*Id.* ¶ 85.)  Plaintiffs allege that they paid ADP a $1200 fee to set up an account.  (*Id.* ¶ 176.)  The

---

[1] In considering a motion to dismiss, the law requires, as described below, I take the facts as alleged in a complaint and answer related to counterclaims as true and resolve all ambiguities in favor of the non-moving party.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *see also Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, No. 13 Civ. 07169(LGS), 2014 WL 3639176, at *2 (S.D.N.Y. July 22, 2014) ("Federal Rule of Civil Procedure 12(b) applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint.").  Because the ADP Defendants' motion seeks to dismiss Plaintiffs' complaint, and Plaintiffs' motion seeks to dismiss claims alleged in Label Defendants' counterclaims, I will set out the facts as alleged in each.  For the ADP Defendants' motion to dismiss, I will assume as true all facts alleged in Plaintiffs' complaint; for Plaintiffs' motion to dismiss, I will assume as true all facts alleged in Label Defendants' counterclaims.

[2] "Compl." refers to the Complaint, filed July 23, 2015.  (Doc. 1.)

ADP account was intended to transfer payments from Trusgan's bank account to Schwartzman's bank account. In connection with creating Trusgan's ADP account, Schwartzman sent Barnett a voided Trusgan check on April 25, 2014. (*Id.* ¶¶ 86–88.) Unbeknownst to Schwartzman, however, a voided Label check had already been sent to Barnett from Label's JP Morgan Chase account on April 24, 2014, one day earlier. (*Id.* ¶¶ 90–92.) ADP "ignored" the correct voided Trusgan check of April 25, 2014, (*id.* ¶ 95), and created a payroll that drew money from Label's Chase Bank account instead of from Trusgan's, (*id.* ¶ 98). As a result of this error, Schwartzman began receiving $1,500 bi-monthly payments from Label instead of Trusgan. (*Id.* ¶ 99.) The bank statements incorrectly indicated that payments were coming from "Trusgan, Inc." (*Id.*)

On September 26, 2014, Schwartzman told the Millers that he would no longer be affiliated with Label as of October 6, 2014, (*id.* ¶ 103), and requested that the "stipulations in the Term Sheet be honored," (*id.* ¶ 104). Around the same time, the Millers discovered that ADP was improperly doubling Schwartzman's salary through the two payroll accounts. (*Id.* ¶ 113.) Specifically, Schwartzman and Label's shared accountant, Richard Gilmartin, discovered the payroll error in September 2014, and contacted Barnett and ADP about it. (*Id.* ¶¶ 113–14.) Barnett refused to speak to Gilmartin, and, instead, on or about October 2014, "an ADP employee named Bob Oliverie ("Oliverie"), a Director of Accountant-Sales support, responded to Gilmartin and sent the account opening documents that Barnett had altered along with the voided Label check that Barnett had obtained from Chase." (*Id.* ¶ 116.) Oliverie

> incorrectly but falsely told Gilmartin that Schwartzman had emailed a Label check to ADP and had also submitted documents with Label's bank account numbers to ADP that was used to set up the Trusgan payroll that resulted in the erroneous payments. As support, Oliverie and ADP provided Gilmartin the altered documents as evidence that Schwartzman was responsible for the unauthorized debits by ADP on Label's Chase Bank account.

(*Id.* ¶ 117.) ADP "presented the same falsehoods to Label, and told them that Schwartzman had

submitted the Label check and bank account numbers to ADP," (*id.* ¶ 118), despite having the "correct voided Trusgan check" in its possession, (*id*. ¶ 120).

On October 17, 2014, the Label Defendants began their "campaign of calumny" against Plaintiffs by sending a "newsletter" by email to Label customers claiming that: (1) Schwartzman committed fraud during his employment at Label; (2) Defendants were pursuing criminal charges against Schwartzman for embezzling funds; and (3) Schwartzman's claim that he can offer Label's products at a cheaper price is false because Defendants received commitments from their suppliers that the suppliers will not do business with Schwartzman. (*Id.* ¶¶ 130–31.) When Schwartzman learned about the newsletter, he asked Gilmartin about it. (*Id.* ¶ 139.) Gilmartin, who at the time was "under the impression that Schwartzman had erroneously provided a voided Label check instead of a voided Trusgan check," told him about the ADP error, and forwarded him ADP documents that "Barnett had secretly altered." (*Id.* ¶¶ 140–43.) After Schwartzman received the ADP documents, he "immediately advised Gilmartin that the documents he submitted to ADP must have been altered by Barnett and ADP, and he provided the documents that he submitted to ADP and his correspondence with ADP to Gilmartin." (*Id*. ¶ 144.) Schwartzman learned about the payroll error for the first time from Gilmartin and, pursuant to Gilmartin's advice, returned the $19,011.95 to Label. (*Id.* ¶¶ 145–46.)

## B. *Facts Alleged in Label Defendants' Counterclaims*

The Millers hired Schwartzman to serve as Vice President of Sales in August 2013. (Counterclaims ¶ 23.)[3] In that capacity, Schwartzman was to be responsible for managing and training Label's clothiers and overseeing all aspects of the supply chain, from initial client fitting

---

[3] "Counterclaims" refers to part of the Label Defendants' Answer and Affirmative Defenses to Complaint and Counterclaims, ("Answer"), filed October 30, 2015. (Doc. 37.) The Counterclaims begin on page 32 of the Answer.

and sales, to interacting with wholesalers and manufacturers.  (*Id.*)  Schwartzman was privy to all of Label's confidential business plans and client information.  (*Id.* ¶¶ 23–24.)  He was paid a substantial base salary, plus travel and entertainment expenses, and a percentage of his commissions.  (*Id.* ¶ 25.)

Schwartzman proved to be an ineffective salesman and failed to conduct himself in a professional manner.  (*Id.* ¶ 26.)  The Millers began receiving customer complaints about Schwartzman's quality of service, (*id.* ¶ 28), and Schwartzman also acted in a manner inconsistent with Label's interests, (*id.* ¶ 27).  For example, he charged personal expenses to Label credit cards, disappeared for days at a time without notice, and actively tried to steal customers for his own side business during Label work hours and using Label resources.  (*Id.* ¶ 29.)

In January 2014, the Millers held a meeting with Schwartzman to discuss these problems, including the fact that Schwartzman's behavior was "scaring away referrals by making potential clients uncomfortable and being unfriendly and awkward, and that he was not following LABEL's pricing policies appropriately—*e.g.*, Schwartzman cut side deals on LABEL products with favored clients at below-market rates and used LABEL products for payment in kind to cover his personal expenses."  (*Id.* ¶ 30.)  The intervention was unsuccessful and did not affect Schwartzman's performance or stop him from engaging in this behavior.  (*Id.* ¶¶ 31–35.)

While still employed by Label, Schwartzman surreptitiously contacted Label clients, misrepresented that he was placing orders for them through Label, and instead placed the orders through his own company.  (*Id.* ¶ 36.)  For example, Schwartzman communicated with a Label supplier about a large order in August 2014.  The supplier asked whether the "orders were still under Label," to which Schwartzman replied, "all these orders are under me not Label," and "I

was only sending them to you because I can't risk them accidentally being sent through Label." (*Id.* ¶ 37.)  A client subsequently complained to Label about the fit of the order, delivery times, and customer service, believing that Label had been responsible.  (*Id.* ¶ 39.)  Label believes that "Schwartzman placed multiple such secret side orders for his own benefit and misrepresented to customers that they were buying [Label] products."  (*Id.*)  Schwartzman also told Label customers that he was opening up his own business and that "he could continue to service these customers at this new business where he would provide better customer service and pricing than Label, while offering the same exact product."  (*Id.* ¶ 40.)

"In or about March 2014, Schwartzman requested that [Label] pay his base salary through Trusgan," and Label agreed because it believed—based upon Schwartzman's representations—that Trusgan was merely a holding company.  (*Id.* ¶ 43.)  Label set up an ADP account through which Trusgan was to be paid by Label.  (*Id.*)  Unbeknownst to Label, Schwartzman set up an additional ADP payroll account, purportedly to pay Schwartzman from Trusgan's account.  (*Id.* ¶ 44.)  Instead of sending ADP a voided Trusgan check, however, Schwartzman arranged for ADP to receive a voided Label check, resulting in Schwartzman being paid out of Label's account instead of Trusgan's.  (*Id.* ¶ 45.)  Over the next approximately five or six months, "Schwartzman's payroll scheme caused ADP to draw payments from LABEL's accounts to pay Schwartzman nearly $20,000" and "Schwartzman hid this fact from LABEL, who continued to pay Schwartzman his salary unaware that Schwartzman was simultaneously having Trusgan siphon additional, unauthorized money from LABEL's account."  (*Id.* ¶ 48.)  Label discovered "Schwartzman's embezzlement scheme" in October 2014, and after the discovery, Schwartzman repaid the $20,000 to Label.  (*Id.* ¶ 49.)

Label relies on high quality customer service, product quality, and competitive pricing,

and maintains accurate, individualized measurements for each client. (*Id.* ¶ 50.) Label has spent considerable time and resources compiling specific information about its clients, such as height, weight, age, build, posture, fit preferences, whether they wear a watch and on which hand, and up to 30 discrete body measurements. (*Id.* ¶¶ 52–53.) Label has also spent considerable time and resources creating resources to ensure the gathering of detailed customer and garment information, which serve as checklists for salespersons. (*Id.* ¶ 54.) Its pricing method was also developed through research and identification of private fabric wholesalers and suppliers, many of whom are overseas and not readily identifiable to the general public, and through negotiated pricing and supply agreements. (*Id.* ¶ 55.) Label's pricing and price lists are not publicly available. (*Id.*)

Schwartzman had access to all of this information while working at Label. (*Id.* ¶ 57.) At the time of his resignation, Schwartzman had access to Label computers and refused to confirm that he would return and/or destroy all of Label's confidential information. (*Id.* ¶ 61.) During an October 8, 2014 meeting, Schwartzman told the Millers that he would "go after" all of Label's top customers. (*Id.* ¶ 62.)

After Schwartzman left Label, David Miller was told by Label clients that Schwartzman had approached them and "represented . . . that he could easily handle former Label clients through Trusgan, because Schwartzman had these Label clients' measurements and other information regarding their previous orders from Label." (*Id.* ¶ 63.) Former Label employee Brett Seeman, who at the time had taken over servicing the clients that Schwartzman had previously covered while he was employed by Label, told the Millers that Schwartzman had been telling Label clients that he had their measurements. (*Id.* ¶ 64.) Schwartzman told Label customers that "he can beat LABEL's pricing . . . by 20% to 30% while offering the exact same

product, from the same manufacturers and using the same fabrics." (*Id.* ¶ 65.)

Schwartzman also poached various Label employees, inducing them to breach their duties and bring confidential Label information with them to Trusgan. (*Id.* ¶¶ 66–72.)

## II.  <u>Procedural History</u>

On July 23, 2015, Plaintiffs commenced this action by filing the Complaint. (Doc. 1.) On October 30, 2015, the Label Defendants answered the Complaint, asserting defenses, affirmative defenses, and counterclaims. (Doc. 37.) On March 22, 2016, the ADP Defendants filed their motion to dismiss the Complaint, (Doc. 62), and a memorandum of law and declaration in support of their motion, (Docs. 63–64). On April 26, 2016, Plaintiffs filed an opposition to the ADP Defendants' motion to dismiss. (Doc. 73.) On May 13, 2016, the ADP Defendants filed their reply in further support of their motion. (Doc. 77.)

On March 22, 2016, Plaintiffs filed their partial motion to dismiss the Label Defendants' counterclaims, (Doc. 66), and a memorandum of law and declaration in support of their motion, (Docs. 67–68). On April 26, 2016, the Label Defendants filed their opposition. (Doc. 72.) On May 13, 2016, Plaintiffs filed their reply in further support of their motion. (Doc. 78.)

On March 27, 2017, Plaintiffs advised that Schwartzman had filed for Chapter 7 bankruptcy in the United States Bankruptcy Court, Middle District of Tennessee. (Doc. 81.) On March 28, 2018, Plaintiffs filed a status update, explaining that Schwartzman was discharged from bankruptcy on June 19, 2017 and noting that Plaintiffs' counsel had been authorized to be employed as special counsel for the Trustee in this matter. (Doc. 82.) After the parties appeared telephonically for a status conference to discuss the effect of Schwartzman's bankruptcy filing and subsequent discharge on the pending motions, the parties filed a joint motion to substitute the Jeanne Anne Burton, Trustee in Bankruptcy for the Estate of Brad Schwartzman, as the

plaintiff/real party-in-interest under Rules 17(a) and 25(d) of the Federal Rules of Civil

Procedure, (Doc. 87), which I granted, (Doc. 88).

### III. <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). The pleading standard applicable to complaints under

Federal Rule of Civil Procedure 12(b)(6) applies equally to counterclaims. *See Gerdau*

*Ameristeel*, 2014 WL 3639176, at *2 ("Federal Rule of Civil Procedure 12(b) applies equally to

claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the

same standard as a motion to dismiss a complaint."); *Wells Fargo Bank Nw., N.A. v. Taca Int'l*

*Airlines, S.A.*, 247 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (noting that a "motion to dismiss

counterclaims is governed by Rule 12(b)(6)").

A claim will have "facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft*, 556 U.S. at 678. This standard demands "more than a sheer possibility that a

defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the

full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of alternative explanations so obvious that they render plaintiff's inferences

unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion made pursuant to 12(b)(6), a court is limited to the facts alleged

in the complaint and required to accept those facts as true. *Kassner*, 496 F.3d at 237. "A

complaint 'is deemed to include any written instrument attached to it as an exhibit or any

statements or documents incorporated in it by reference.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "This generally occurs when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.'" *Nicosia*, 834 F.3d at 231 (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)).

## IV.    **The ADP Defendants' Motion to Dismiss**

With respect to ADP, Plaintiffs claim that, as a result of errors ADP and Barnett committed in enrolling Trusgan into ADP's payroll services, Plaintiffs suffered contractual, consequential, incidental, and economic damages. (Compl. ¶¶ 177, 180, 184, 189, 196.) Plaintiffs assert claims of, among other things, (1) breach of contract, (*id.* ¶¶ 172–80), (2) breach of the implied covenant of good faith and fair dealing, (*id.* ¶¶ 181–84), (3) negligent misrepresentation, (*id.* ¶¶ 190–96), and (4) defamation against ADP, (*id.* ¶¶ 185–89).

With respect to the contract- and quasi-contract based claims, ADP moves to dismiss on the basis that the parties' relationship is governed by the Terms and Conditions of Services for Run Powered by ADP® Online Payroll Services ("Services Agreement"), signed by Plaintiffs on

April 10, 2014.  (*See* Pope Decl. Ex. A, at 5.)[4]  With respect to the negligent misrepresentation and defamation claims, ADP moves to dismiss on the ground that Plaintiffs fail to state a claim for relief.

**A.**    ***The Services Agreement Controls the Relationship Between ADP and Plaintiffs***

According to the Complaint, ADP breached its agreement with Plaintiffs by depositing funds into Schwartzman's account from Label's account instead of Trusgan's.  (Compl. ¶ 174.) As a result of that breach, Plaintiffs seek $1,200, which represents the services fee paid to ADP in exchange for ADP's payroll services, as well as consequential and incidental damages of at least $75,000.  (*Id.* ¶ 176.)

The relationship between ADP and Plaintiffs is governed by the Services Agreement, signed by Plaintiffs on April 10, 2014.  (Pope Decl. Ex. A, at 5.)  Plaintiffs argue that the Services Agreement is non-binding because Schwartzman was given only the signature page, without the other ten pages.  (Pls.' Br. 13.)[5]  Schwartzman's signature appears on a page marked "Page 4 of 11," with terms that begin in the middle of Section 12(A) and continue through Section 15.  (Pope Decl. Ex. A, at 5.)  Above the signature box is text that reads, in relevant part:

> THE SERVICES, PRICING AND AUTHORIZATIONS COVERED BY THE INITIAL PAGES OF THIS SALES ORDER ARE PROVIDED IN ACCORDANCE WITH THESE 11 PAGES OF THE TERMS AND CONDITIONS OF SERVICE FOR RUN POWERED BY ADP® ONLINE PAYROLL SERVICES ("RUN TERMS").  BY SIGNING THIS SALES ORDER INCLUDING THESE RUN TERMS, YOU ACKNOWLEDGE RECEIPT OF AND AGREE TO THESE RUN TERMS.

---

[4] The Services Agreement is "integral to the complaint," as it is the contract "upon which the plaintiff's complaint stands or falls."  *See Glob. Network Commc'ns*, 458 F.3d at 230–31.  Plaintiffs do not dispute that the Services Agreement is incorporated by reference into the Complaint.  "Pope Decl." refers to the Declaration of John Houston Pope, filed March 22, 2016.  (Doc. 63.)

[5] "Pls.' Br." refers to Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion to Dismiss the Counterclaims, filed March 22, 2016.  (Doc. 68.)

(*Id.*)  Plaintiffs allege that Schwartzman was only shown page 4 of the Services Agreement and was not aware of the relevant terms and conditions when he signed it.  (Compl. ¶¶ 76–78.)

Despite not receiving ten pages of the Services Agreement, Plaintiffs are nevertheless bound by the terms in the Services Agreement.  Under New York law, "a party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a document on the ground that he or she did not read it or know its contents." *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014) (quoting *Brandywine Pavers, LLC v. Bombard*, 970 N.Y.S.2d 653, 655 (4th Dep't 2013)).  "Furthermore, 'a signer's duty to read and understand that which it signed is not diminished merely because the signer was provided with only a signature page.'"  *Id.* (quoting *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 969 N.Y.S.2d 653, 655 (4th Dep't 2013)); *see also Friedman v. Fife*, 692 N.Y.S.2d 61, 62 (1st Dep't 1999) ("Plaintiff will not be heard to claim that he received only a signature page for the stock restriction agreement, since he was bound to know and read what he signed.").  Therefore, accepting the allegations as true, I find that (1) Schwartzman had a duty to read the Services Agreement, (2) the allegations in the Complaint do not alter that conclusion, and (3) Plaintiffs cannot be heard to now claim ignorance of its terms.  In addition, the signature page here provided Schwartzman with explicit notice of additional terms and conditions.  (*See* Pope Decl. Ex. A, at 5.)

Plaintiffs cite to *Martin v. Citibank* to support their argument that they are not bound by the Services Agreement.  Plaintiffs' reliance on *Martin* is misplaced, since the facts in *Martin* make it inapplicable to the factual scenario described in Plaintiffs' Complaint.  In *Martin*, the First Department concluded that a plaintiff who signed the signature page of an agreement was not bound by terms in missing pages from a document.  883 N.Y.S.2d 483, 486 (1st Dep't 2009).

However, in *Martin* unlike here, the signature page did not put the plaintiff on notice that he was binding himself to additional terms; it merely contained a statement of acknowledgement of receipt of a copy of a lease, which itself included a limited liability provision. *See M&T Bank v. HR Staffing Solutions, Inc.*, 964 N.Y.S.2d 847, 849 (4th Dep't 2013) (distinguishing *Martin* as a case where plaintiff could not have known about relevant provision because additional pages were missing and only reference to it was on missing pages). In stark contrast, the signature page of the Services Agreement explicitly states that, by signing the agreement, Schwartzman, acting as principal for Trusgan, agreed to the terms contained on the additional pages.

Indeed, the weight of authority decidedly favors the ADP Defendants' position. *See Vulcan Power Co. v. Munson*, 932 N.Y.S.2d 68, 69 (1st Dep't 2011) ("A signer's duty to read and understand that which is signed is not 'diminished merely because the signer was provided with only a signature page."); *Hotel 71 Mezz Lender LLC v. Falor*, 882 N.Y.S.2d 414, 415 (1st Dep't 2009) ("Nor was defendant's duty to make inquiry and to read and understand the [relevant provision] diminished merely because she was provided with only a signature page before executing the agreement."); *Friedman*, 692 N.Y.S.2d at 62 ("Plaintiff will not be heard to claim that he received only a signature page for the stock restriction agreement, since he was bound to know and read what he signed."); *cf. Arnav Indus., Inc. Ret. Tr. v. Brown, Raysman, Millstein, Felder & Steiner, L.L.P.*, 751 N.E.2d 936, 939 (N.Y. 2001) ("[A] party who signs a document is conclusively bound by its terms absent a valid excuse for having failed to read it."),

*overruled on other grounds by Oakes v. Patel*, 988 N.E.2d 488 (N.Y. 2013).[6]

## B.     *The Services Agreement Limits Liability*

The Services Agreement contains the following limited liability provision:

> C. Limit on Monetary Damages  Notwithstanding anything to the contrary contained in this Agreement (other than as set forth in Section 11.A. and any direct damages incurred by You as a result of ADP's breach of Section 8B. above), ADP's aggregate liability under this Agreement during any calendar year for damages (monetary or otherwise) under any circumstances for claims of any type or character made by You or any third party arising from or related to the Services, will be limited to the lesser of (i) the amount of actual damages incurred by You or (ii) ADP's charges for the affected Services; provided however, that ADP's aggregate liability hereunder in any calendar year will not exceed the average charge for one payroll processing paid by You to ADP for the payrolls services during such calendar year.  ADP will issue You a credit(s) equal to the applicable amount and any such credit(s) will be applied against subsequent fees owed by You.

(Pope Decl. Ex. A, ¶ 11(C).)  The ADP Defendants argue that, under this limited liability provision, Trusgan can only recover from ADP "credit(s) equal to the applicable amount."  (*Id.*; *see also* ADP Br. 12.)[7]  Plaintiffs argue that Section 11(C)'s exception—"other than as set forth in Section 11.A"—applies.  Section 11(A) allows for reimbursement for actual damages resulting from "willful misconduct" of ADP or any of its employees:

> A. ADP Responsibility  ADP shall correct any of Your reports, data or tax agency filings, as the case may be, produced incorrectly as a result of an ADP error, at no charge to You.  Additionally, ADP shall reimburse You for (i) actual damages incurred by You as a direct result of the criminal or fraudulent acts or willful misconduct of ADP or any of its employees, (ii) any penalty imposed against You as a result of an error or omission made by ADP in performing the Tax Filing Services or (iii) any interest assessed against You as a result of ADP holding Your tax funds past the applicable due date as a result of an error or omission made by

---

[6] Even if I were to find that Plaintiffs are not bound by the Services Agreement, Plaintiffs do not sufficiently allege contractual liability beyond the $1,200 servicing fee, as they do not plausibly allege that the additional consequential damages sought—attorney's fees and costs spent in pursuing claims against Label—were caused by ADP's breach. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52–53 (2d Cir. 2011) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." (quoting *Nat'l Market Share v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004))).

[7] "ADP Br." refers to the Memorandum of Law in Support of Motion to Dismiss by ADP Defendants, filed March 22, 2016.  (Doc. 64.)

ADP in performing the Tax Filing Services.

(*Id.* ¶ 11(A).) Plaintiffs argue that ADP and Barnett "intentionally altered account numbers and signatures on Trusgan's documents and obtained a check from Chase Bank without authorization from Trusgan or Label while ignoring the correct check that Trusgan sent." (Pls.' Br. 8; *see also* Compl. ¶¶ 90–98, 182.) This, they contend, constituted willful misconduct triggering the exception in 11(C) allowing for monetary damages instead of ADP credit.

Other than Plaintiffs' conclusory statements, the allegations in the Complaint do not suggest that ADP or Barnett's actions were intentional or willful. Specifically, the Complaint alleges that Barnett requested a voided check from Schwartzman, twice on April 23, 2014, and again on April 24, 2014. (Compl. ¶¶ 86–87.) On April 24, Barnett or some other ADP employee, in a "rush[] to meet sales quota . . . and to enrich himself," (*id.* ¶ 93), "directly contacted Chase Bank" without authorization to request a voided check, (*id.* ¶ 91). "As a result, on April 24, 2014 at approximately 12:43 P.M., a Label check bearing check number '0000' was faxed from Chase Bank to ADP." (*Id.* ¶ 92.) ADP then "wholly ignored" the correct Trusgan check sent by Schwartzman the following day. (*Id.* ¶ 95.) It makes little sense how or why ADP would preemptively contact and receive an incorrect check from Chase without authorization for the purpose of meeting a sales quota, and even less sense that a Chase employee would honor that request. Nevertheless, even if true, ADP's actions—"wholly ignor[ing] the correct voided check" with the accurate account information—are negligent at best, and do not rise to the level of willful misconduct.

Further, Section 11(A)'s provision of "actual damages" for such willful and intentional misconduct does not include consequential damages. Section 11.D explicitly limits liability with respect to all consequential and indirect damages:

> Neither ADP, nor you will be responsible for special, indirect, or incidental, consequential or other similar damages (including lost profits or damages for business interruption or loss of information) that the other party may incur or experience in connection with this Agreement or the services, however caused and under whatever theory of liability, even if such party has been advised of the possibility of such damages.

(Pope Decl. Ex. A ¶ 11(D).)  Thus, even if ADP's conduct was intentional, Plaintiffs would be unable to collect other claimed damages, such as "financial expense, legal fees and lost sales." (Compl. ¶ 180.)

Plaintiffs also argue that ADP's limited liability provisions are void because the ADP Defendants "acted with 'malice, recklessness, or callous indifference' to Plaintiffs' rights when they altered Trusgan's documents and hid their actions to avoid liability."  (Pls.' Br. 7.) However, ADP's actions do not rise to the high level of extreme culpability such that the liability clause is nullified as a matter of law.  At most, the Complaint alleges that Barnett or another ADP employee acted with the purpose of meeting a sales quota.  This is insufficient to void the contract provision.  *See, e.g.*, *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) ("A party acting in their own economic self-interest is not enough to constitute gross negligence or willful misconduct.").

Plaintiffs also allege punitive damages.  Under New York law, punitive damages are available for a breach of contract claim if the plaintiff can demonstrate "(1) that the defendant's conduct is 'actionable as an independent tort; (2) the tortious conduct must be of an egregious nature; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.'"  *N.Y. Marine & Gen. Ins. Co. v. Tradeline*, 266 F.3d 112, 130 (2d Cir. 2001) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995)).  In addition to the fact that ADP's alleged misconduct does not rise above mere negligence, the Complaint also fails to allege that the conduct was "directed" at Plaintiffs or that it was part of a

pattern directed at the public generally. Therefore, punitive damages are unwarranted.

Therefore, the damages recoverable for those causes of action against ADP that survive the motion to dismiss would be limited to the $1,200 services fee.

### C. *Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs also argue that the ADP Defendants "intentionally subverted the contract by hiding their breach to Plaintiffs' detriment when their mistake was found," and by doing so breached the implied covenant of good faith and fair dealing. (Pls.' Opp. 19.)[8]

> Under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts." The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. Specifically, implied in every contract is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." That said, the implied covenant arises "only in connection with the rights or obligations set forth in the terms of the contract," and "cannot create duties that negate explicit rights under a contract."

*In re LIBOR–Based Fin. Instruments Antitrust Litig.,* 962 F. Supp. 2d 606, 631–32 (S.D.N.Y.2013) (citations omitted). This implied duty of good faith "is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation marks omitted). Accordingly, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Therefore, "courts in this circuit consistently dismiss claims for breach of the implied covenant of good faith on these grounds." *See Joseph v. Gnutti Carlo S.p.A.*, No. 15-cv-8910 (AJN), 2016 WL 4764924, at *7

---

[8] "Pls.' Opp." refers to the Memorandum of Law in Support of Plaintiffs' Opposition to ADP Defendants' Motion to Dismiss, filed April 26, 2016. (Doc. 73.)

(S.D.N.Y. Sept. 12, 2016) (citing cases).

In order for Plaintiffs "to assert a cause of action for the breach of good faith and fair dealing that is not duplicative of their breach of contract claim," they "must allege that Defendants 'fulfilled their contractual obligations' but that those obligations were carried out 'in bad faith in order to deprive Plaintiffs of the benefit of their bargain.'" *Id.* (quoting *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333–34 (S.D.N.Y. 2010)). In other words, Plaintiffs must allege that Defendants, "in bad faith, engaged in acts that had the effect of destroying or injuring plaintiffs' right to receive 'the fruits of the contract.'" *Demetre v. HMS Holdings Corp., 7 N.Y.S.3d 110, 112 (1st Dep't 2015).

Here, apart from the factual allegations in support of their breach of contract claim, Plaintiffs allege that ADP's failure to exculpate Plaintiffs in the eyes of Label violated the implied covenant. These allegations have nothing to do with Plaintiffs receiving the benefits promised under their contract. *See Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) ("[T]he obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract."). There are no terms of the Services Agreement that obligated ADP to defend Plaintiffs should they be accused of wrongdoing. The allegations are therefore outside the scope of the contract, and "may not form the basis of either a breach-of-contract claim *or* a claim for breach of the implied covenant of good faith and fair dealing." *Long v. Marubeni Am. Corp.*, No. 05 Civ. 0639(GEL), 2006 WL 1716878, at *1 (S.D.N.Y. June 20, 2006). None of ADP's alleged failures to communicate certain information to Label had the effect of subverting the contract itself. *See Butvin v. DoubleClick, Inc.*, No. 99 CIV 4727 JFK, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001) (acknowledging that New York courts recognize separate causes of action for breach of the implied covenant of good faith and

fair dealing where one party attempts to "subvert the contract itself"), *aff'd*, 22 F. App'x 57 (2d

Cir. 2001). Therefore, Plaintiffs' claim for breach of the implied covenant cannot stand.

### D. *Negligent Misrepresentation*

Plaintiffs also assert a claim of negligent misrepresentation against Barnett and ADP.

Specifically, Plaintiffs allege that (1) Barnett and ADP failed to disclose the material facts

concerning their handling of Trusgan's documents and dealings with Chase Bank, (2) they were

in exclusive possession of this information, (3) "Trusgan reasonably relied on the information

that ADP and Barnett supplied and reasonably believed that the account was set up properly

using Trusgan's information and voided check," and (4) Barnett and ADP failed to disclose that

they had altered Trusgan's documents. (Compl. ¶¶ 192–95.) To state a cause of action for

negligent misrepresentation under New York law, a plaintiff must allege: "(1) the existence of a

special or privity-like relationship imposing a duty on the defendant to impart correct

information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on

the information." *Riker v. Premier Capital, LLC*, No. 15-CV-8293, 2016 WL 5334980, at *4

(S.D.N.Y. Sept. 21, 2016) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490

(2d Cir. 2014)).

Plaintiffs have failed to plausibly allege that they had a special or privity-like relationship

with Barnett or ADP, such that they had a duty to inform them of the account alteration. Under

New York law, whether a special relationship exists between two parties is an issue of fact

governed by weighing three factors: "[1] whether the person making the representation held or

appeared to hold unique or special expertise; [2] whether a special relationship of trust or

confidence existed between the parties; and [3] whether the speaker was aware of the use to

which the information would be put and supplied it for that purpose." *Suez Equity Investors,*

*L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 715, 719 (N.Y. 1996)).  Plaintiffs "must establish something beyond an ordinary arm's length transaction where 'defendants initiated contact with plaintiffs, induced them to forbear from performing their due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information.'"  *Naughright v. Weiss*, 826 F. Supp. 2d 676, 688 (S.D.N.Y. 2011).

First, Barnett's role as an account manager for ADP payroll enrollment does not involve any "unique or specialized expertise" such that he was in a special position of instilling confidence or trust.  The Complaint states only that Barnett "solicit[ed] ADP's business from Schwartzman and Trusgan, and possibly the Millers and Label," (Compl. ¶ 61), and then "began discussing and corresponding" with Schwartzman about setting up a payroll account with ADP, (*id.* ¶¶ 66–67).  At most, Plaintiffs' relationship with Barnett and ADP was merely that of an arm's length commercial transaction, which typically "lack[s] the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation."  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (quoting *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 460 (S.D.N.Y. 2006)); *see also M & T Bank Corp. v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324, 337–38 (W.D.N.Y. 2012) ("New York courts and federal courts applying New York law have continued to follow the general rule of non-actionability for negligent misstatements made in the context of arms-length business transactions.").  Nor could the special relationship have been born of Barnett's taking it upon himself to alter account information on Plaintiffs' behalf, as the "requisite relationship between the parties must have existed before the transaction from which the alleged wrong emanated, and not as a result of it."  *Gregor v. Rossi*, 992 N.Y.S.2d 17, 19 (1st Dep't 2014).

Furthermore, even if such a fiduciary relationship existed, Plaintiffs could not have reasonably relied on ADP's withheld information. A plaintiff "cannot establish justifiable reliance when 'by the exercise of ordinary intelligence' it could have learned of the information it asserts was withheld." *M & T Bank*, 852 F. Supp. 2d at 339 (quoting *PPI Enters. U.S. v. Del Monte Foods Co.*, No. 99 Civ. 3794(BSJ), 2003 WL 22118977, at *20 (S.D.N.Y. Sept. 11, 2003)). Here, any person of reasonable intelligence in Schwartzman's situation would have discovered that he was being paid double his normal salary over the course of several months and made some inquiry. This is particularly true here since Schwartzman was starting a new business where one would expect there would be more intense focus on the businesses banks accounts and the money flow.

### E. *Defamation*

"To state a claim for defamation under New York law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Thia v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) (quoting *Gargiulo v. Forster & Garbus, Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009)). "It is the responsibility of the jury to determine whether the plaintiff has actually been defamed; however, a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir.1997). "The court's threshold inquiry is guided not only by the meaning of the words as they would be commonly understood, but by the words considered in the context of their publication." *Id.* (citation omitted).

The ADP Defendants contend that the allegations are insufficiently specific in pleading the defamatory communications. "While the federal rules do not require the particularized pleading requirements set forth in New York's C.P.L.R. section 3016, Rule 8 of the Federal Rules of Civil Procedure still requires that each pleading be specific enough to afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012).

Contrary to the ADP Defendants' argument that the Complaint is insufficiently specific, the allegations—though somewhat complicated on their face—are clear. The Complaint alleges that ADP told Label that Schwartzman had submitted the Label check and bank account numbers, and forwarded the allegedly altered documents, to cover up its own mistakes. (*See* Compl. ¶¶ 116–20.) The Complaint alleges, among other things, that Oliverie, an ADP employee, (1) "incorrectly but falsely told Gilmartin that Schwartzman had emailed a Label check to ADP and had also submitted documents with Label's bank account numbers to ADP," (*id.* ¶ 117); (2) forwarded the "altered" documents and voided Label check, (*id.* ¶ 116); and (3) ADP "presented the same falsehoods to Label, and told them that Schwartzman had submitted the Label check and bank account numbers to ADP," (*id.* ¶ 118), despite having the "correct voided Trusgan check" in its possession, (*id.* ¶ 120). These alleged factual statements carry the obvious implication that Schwartzman was a thief and that he was submitting Label account information without authorization in an attempt to steal money. These statements are "reasonably susceptible of defamatory meaning." *See Biro*, 883 F. Supp. 2d at 457. Therefore, taking the statements as true and drawing every inference in Plaintiffs' favor, they have stated a claim for defamation. Whether the statements are in fact false remains to be seen, and must await discovery.

Plaintiffs also contend that ADP was on notice of Label's defamation and its foreseeable consequences such that ADP's actions also make them liable for Label's "republication" of the defamation. While not alleged in the Complaint, Plaintiffs seek to amend the Complaint to add certain facts relating to ADP being put on notice of Label's defamation. (*See* Maduegbuna Decl. ¶ 3 ("By a letter dated December 24, 2014, our firm sent ADP a demand letter advising them that Label was currently and continuously defaming Plaintiffs based on the altered documents that ADP gave Label, and that Label had reported Schwartzman to the District Attorney's office.").)

It is not clear whether the proposed amendments to the Complaint state a claim for recovery under a theory of republication. The Second Circuit has held that "a plaintiff may not recover damages from the original author for either product disparagement or slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48, 59 (2d Cir. 2002). Some district courts apply a "foreseeability standard under which the originator of the defamatory statement is liable for the foreseeable republication of the statement," but the New York Court of Appeals has not definitely answered the question. *Aguirre v. Best Care Agency, Inc*., 961 F. Supp. 2d 427, 455 n.16 (E.D.N.Y. 2013) (collecting cases). Rather than delve into this open question of New York law, I will allow Plaintiffs an opportunity to amend the Complaint as to the republication question.

## V.     **Plaintiffs' Motion to Dismiss the Label Defendants' Counterclaims**

Plaintiffs seek to dismiss the Label Defendants' Lanham Act claim (Sixth Cause of Action) and tortious interference claim (Fifth Cause of Action) for failure to allege sufficient facts, and argue that exercising supplemental jurisdiction over the remaining state law

counterclaims (First, Second, Third, Fourth, and Seventh Causes of Action) is inappropriate.

**A.** *Lanham Act Claim*

Section 43(a)(1) of the Lanham Act provides in pertinent part:

> Any person who, on or in connection with any goods or services . . .
> uses in commerce any . . . false or misleading description of fact, or
> false or misleading representation of fact, which
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive
> as to the affiliation, connection, or association of such person with
> another person, or as to the origin, sponsorship, or approval of his
> or her goods, services, or commercial activities by another person,
> or
>
> (B) in commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of his or her
> or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). The Lanham Act therefore "makes actionable false or misleading

descriptions or false or misleading representations of fact made about one's own or another's

goods or services." *Boule v. Hutton*, 328 F.3d 84, 90 (2d Cir. 2003) (internal quotation marks

omitted).

The Label Defendants claim that Plaintiffs violated the Lanham Act in two respects:

first, while employed by Label, Schwartzman sold what he represented to be Label products but

were not in fact Label products; second, after leaving Label, (Counterclaims ¶ 41), Schwartzman

told customers that "he can beat Label's pricing . . . by 20% to 30% while offering the exact

same product, from the same manufacturers and using the same fabrics," (*id.* ¶ 65). Neither

theory states a claim under the Lanham Act.

**1. False Association**

The Label Defendants allege that Plaintiffs sold products to clients who believed they

were purchasing Label products through him in his capacity as a Label employee.  They provide one example in the Counterclaims to show that a Trusgan client mistakenly believed that he was receiving a Label product:  Schwartzman placed an order with a Label supplier, explaining that the order was for Schwartzman, not Label.  Schwartzman's client subsequently mistakenly complained to Label about "the fit of the order, delivery times, and customer service."  (*Id.* ¶ 39.) Label then "had to explain that they had not placed the order, and had no record of it in their system."  (*Id.*)  The Label Defendants essentially allege that Schwartzman placed orders for himself while representing to clients that they were purchasing Label products through him in his capacity as a Label employee.  (*Id.*)

Assuming—as alleged in the Counterclaims—Schwartzman was using his position as a Label salesman to sell items represented to be Label goods by placing orders with Label suppliers, he was simply unlawfully pocketing proceeds that belonged to his employer; he was not falsely representing the origin of his own goods.  Selling trademarked goods under its trademarked name is not a violation of the Lanham Act.  *See Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."); *see also S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 202 (E.D.N.Y. 2007) ("[W]here a 'purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation' under the Lanham Act." (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073 (9th Cir. 1995)).

The Label Defendants claim that the goods were not in fact Label goods because "Label offers not just the clothes themselves but also the customer service process," which was not

provided by Schwartzman in connection with the orders. (Label Br. 12.)[9] While "distribution of a product that does not meet the trademark holder's quality control standards" may result in devaluation of the mark and thus not a genuine product, the trademark holder must allege that "(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Warner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir.1996). Label's argument that Schwartzman's sales were distinct from Label products by virtue of the quality of service makes no sense in light of the fact that Schwartzman was the Vice President of Sales at Label, making the quality of service he provided one and the same as the quality of service Label provided. Indeed, Label's counterclaims acknowledge that the complaints about "the fit of the order, delivery times, and customer service," were of the type that "had become routine with respect to Schwartzman's work." (Counterclaims ¶ 39.) At most, Schwartzman was providing the same level of service to Label's customers even when he placed orders with Label suppliers for himself. Thus, there is no distinction between the goods Schwartzman sold as Label goods and actual Label goods supplied under Schwartzman's watch. In other words, the Label Defendants cannot state a claim under the Lanham Act for false association based on Schwartzman selling what he represented to be Label goods.

## 2. False Advertising

Defendants allege that Schwartzman "told Label customers that he can beat Label's pricing . . . by 20% to 30% while offering the exact same product, from the same manufacturers and using the same fabrics." (*Id.* ¶ 65.) Label argues that this statement is false because

---

[9] "Label Br." refers to Counterclaim Plaintiffs' Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss the Counterclaims, filed April 26, 2016. (Doc. 72.)

Schwartzman could not in fact provide the same product. (Label Br. 13.) The alleged

misrepresentation was discovered by David Miller, who "had numerous conversations with

Label clients whom Schwartzman had approached." (Counterclaims ¶¶ 63, 65.)

In order to be actionable under the Lanham Act, the alleged misrepresentation must occur

in a "commercial advertising or promotion." 15 U.S.C. § 1125(a). Courts in this Circuit use a

three-part inquiry to determine whether statements constitute "commercial advertising or

promotion" under the Lanham Act: "(1) commercial speech; (2) for the purpose of influencing

consumers to buy defendant's goods or services; and (3) although representations less formal

than those made as part of a classic advertising campaign may suffice, they must be disseminated

sufficiently to the relevant purchasing public." *Boule*, 328 F.3d at 90–91. "[T]he touchstone of

whether a defendant's actions may be considered 'commercial advertising or promotion' under

the Lanham Act is that the contested representations are part of an organized campaign to

penetrate the relevant market. Proof of widespread dissemination within the relevant industry is

a normal concomitant of meeting this requirement." *Fashion Boutique of Short Hills, Inc. v.

Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Alleging some unspecified number of false

statements to customers is insufficient to state "an organized campaign to penetrate the relevant

market." *Id.* (holding that "businesses harmed by isolated disparaging statements do not have

redress under the Lanham Act").

The statements alleged in Defendants' Counterclaims do not suggest "widespread

dissemination within the relevant industry," and more aptly resemble "isolated disparaging

statements" that "do not have redress under the Lanham Act." *Id*. at 57–58. Label makes no

attempt to define the relevant market, but claims to have over 750 clients. (Counterclaims ¶ 26.)

Schwartzman telling an unspecified number of those clients that he could offer the "exact same"

product at a reduced rate does not plausibly allege a sufficient market dissemination under the Lanham Act.  *See Fashion Boutique*, 314 F.3d at 58 (holding that "twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers" did not "satisfy the requirement that representations be disseminated widely"); *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *8 (S.D.N.Y. Sept. 24, 2007) (six statements in marketplace of jewelry retailers insufficient to show penetration of relevant market); *Professional Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) (concluding that dissemination to one of a customer base of at least thirty-six was insufficient).  Nevertheless, because Label may be able to cure these deficiencies, it is not clear that amendment of this counterclaim would be futile.  *See Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 272 (E.D.N.Y. 2014) (allowing plaintiff opportunity to replead facts to support claim of dissemination to relevant market).

In addition, Label's allegations of the falsity of the alleged misrepresentations are also insufficient, but may be repled with more specificity as well.  "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers."  *Dentsply Int'l v. Dental Brands for Less LLC*, No. 15 Civ. 8775 (LGS), 2016 WL 6310777, at *4 (S.D.N.Y. Oct. 27, 2016) (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).  The Label Defendants have not alleged that Schwartzman's alleged contention that he use "the same manufacturers and . . . the same fabrics" was literally false.  In their brief in opposition to Schwartzman's motion to dismiss, the Label Defendants request leave to amend their counterclaims to state that Schwartzman lacked access to their fabrics and suit styles.  (*See* Label Br. 13 n.47.)  I find that affording them the opportunity to replead facts to support their claim

may not be futile.

Accordingly, the Label Defendants may amend their counterclaim for false advertising

under the Lanham Act within thirty days of this Opinion & Order.

### B. *Supplemental Jurisdiction*

Even if the Label Defendants' Lanham Act claims were dismissed in their entirety, I

would still exercise jurisdiction over their state law counterclaims.

A compulsory counterclaim is:

any claim that—at the time of its service—the pleader has against an opposing party
if the claim:

> (A) arises out of the transaction or occurrence that is the subject matter of
> the opposing party's claim; and

> (B) does not require adding another party over whom the court cannot
> acquire jurisdiction.

Fed. R. Civ. P. 13(a).  A counterclaim that is not compulsory is considered "permissive."  Fed.

R. Civ. P. 13(b).

> Whether a counterclaim is compulsory or permissive turns on whether the
> counterclaim arises out of the transaction or occurrence that is the subject matter of
> the opposing party's claim, and this Circuit has long considered this standard met
> when there is a logical relationship between the counterclaim and the main claim.
> Although the logical relationship test does not require an absolute identity of factual
> backgrounds, the essential facts of the claims must be so logically connected that
> considerations of judicial economy and fairness dictate that all the issues be
> resolved in one lawsuit.

*Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir.2004) (citations and internal

quotation marks omitted).

Plaintiffs' claims against the Label Defendants are for false advertising under the Lanham

Act (Sixth Count), defamation (Seventh Count), tortious interference with a business relationship

(Eighth Count), and trade libel (Ninth Count).  The Label Defendants' state counterclaims are for

unfair competition (First Cause of Action), breach of fiduciary duty (Second Cause of Action), misappropriation of trade secrets (Third Cause of Action), tortious interference with contractual relations (Fourth Cause of Action), tortious interference with prospective economic advantage (Fifth Cause of Action), and breach of the covenant of good faith and fair dealing (Seventh Cause of Action). Contrary to Plaintiffs' argument, the counterclaims arise out of the same transaction or occurrence as the underlying claims, and have more in common than simply a former employer-employee relationship; both relate to the underlying circumstances that soured the parties' business relationship and competition for the same clients, namely, Schwartzman's behavior while working for Label, and the representations made by each party about the other to potential clients. The "logical relationship" between the claims in the Complaint and Counterclaims is clear. *See id.* at 209–10.

## C. *Tortious Interference with Prospective Economic Advantage*

As noted above, the Label Defendants assert a cause of action for tortious interference with prospective economic advantage. To state such a claim under New York law, a party must establish "(1) that [he] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (internal quotation marks omitted). "The wrongful means requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim." *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

To satisfy the "wrongful means" element, Label must demonstrate that Plaintiffs "committed a 'crime or an independent tort,'  or applied economic pressure 'for the sole purpose of inflicting intentional harm on [Label].'"  *Rockland Exposition, Inc. v. Alliance of Automotive Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 333 (S.D.N.Y. 2012) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)).  Plaintiffs principally argue that the allegations related to this counterclaim fail to allege "wrongful means."[10]

First, with respect to alleged interference with Label's relationship with former employees, the Label Defendants argue that "wrongful means" need not be established because Schwartzman induced the employees to violate their non-compete agreements.  (Label Br. 17.)  This argument highlights its main flaw:  Label's relationship with its former employees is contractual, and a claim for tortious interference with prospective economic advantage cannot be brought absent a "business relationship."  *See Johnson & Johnson v. American Nat. Red Cross*, 528 F. Supp. 2d 462, 464 (S.D.N.Y. 2008) ("New York courts have dismissed complaints that failed to allege the specific business relationship that was interfered with.").  There are no allegations to suggest that Label's relationship with those employees is a business relationship, and interference with the non-compete agreements is already alleged as the basis for tortious interference with contractual relations (Fourth Cause of Action).

Next, the Label Defendants contend that Plaintiffs interfered with their relationship with clientele using "wrongful means" by use of a "false advertising campaign."  (Label Br. 17.)  Assuming the Label Defendants are able to allege a claim under the Lanham Act upon amendment, *see supra* V.A.ii, such allegations are also sufficient to demonstrate the "wrongful

---

[10] Plaintiffs also argue that the Counterclaims fail to plead facts suggesting malice.  In this respect, the pleadings are sufficient, especially given the numerous allegations regarding the ill will between the parties.

means" element of tortious interference. *See MDB LLC v. Hussain*, No. 14-CV-9281 (VEC), 2016 WL 1267793, at *7 (S.D.N.Y. Mar. 29. 2016) ("Liability may also lie where the defendant acted through 'wrongful means,' which the New York Court of Appeals has construed to include 'physical violence, *fraud or misrepresentation*, civil suits and criminal prosecutions,' or 'extreme and unfair economic pressure.'" (emphasis added) (quoting *Carvel Corp.*, 818 N.E.2d at 1105)).

## VI.  Conclusion

For the foregoing reasons, the ADP Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  It is granted with respect to all claims except Plaintiffs' claim for defamation (Fourth Count).  To the extent Plaintiffs seek to amend the Complaint to add certain facts related to their defamation claim, (Pls.' Opp. 25), their motion is GRANTED and they may amend the complaint within thirty (30) days of this Opinion & Order.

Plaintiffs' motion to dismiss the Label Defendants' Counterclaims is GRANTED IN PART and DENIED IN PART.  The Lanham Act claims are dismissed, but the Label Defendants may amend the Counterclaims with respect to false advertising under the Lanham Act within thirty (30) days of this Opinion & Order.  The motion to dismiss is DENIED with respect to the Label Defendants' other state law counterclaims.

The parties are directed to meet and confer regarding discovery and file a proposed Case Management Plan and Scheduling Order within forty-five (45) days of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the open motions.  (Docs. 62, 66.)

SO ORDERED.

Dated: September 30, 2018
      New York, New York

Vernon S. Broderick
United States District Judge